IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENELOPE RIGATOS, | CIVIL ACTION NO. |
| Plaintiff, | |
| v. | |
| PEERSTAR LLC, | |
| Defendant. | |

## COMPLAINT

Plaintiff Penelope Rigatos files this Complaint against Defendant Peerstar LLC ("Peerstar"), seeking relief from Peerstar's violations of the False Claims Act ("FCA" – 31 U.S.C. §§ 3729-3733) and the Pennsylvania Whistleblower Law ("WBL" – 43 P.S.§§ 142 *et seq.*), and in support states the following:

## PRELIMINARY STATEMENT

1.     Peerstar markets itself as a pioneering behavioral health organization which provides peer support services to individuals living with mental health and recovery challenges. Peerstar believes that through its support services model, it can help people move toward wellness, independence, and lasting recovery.

2.     Under this guise, Rigatos began working for Peerstar as a Certified Peer Support Specialist ("CPS"). However, when Rigatos began working with patients, she discovered numerous issues involving patient care and patient billing. Beginning in March 2026, Rigatos made numerous reports about these issues to Peerstar.

3.     On April 10, 2026, Peerstar suspended Rigatos, just weeks after she began reporting issues of waste, wrongdoing, and fraud within Peerstar's day-to-day operations and Medicaid billing practices. Soon after, Rigatos' employment with Peerstar was terminated.

1

4.      Rigatos is initiating this matter pursuant to the FCA and WBL, to address the retaliatory actions undertaken by Peerstar after she reported issues of waste, wrongdoing, and fraud by Peerstar.

### THE PARTIES

5.      Plaintiff Penelope Rigatos is an adult individual who resides in Havertown, Pennsylvania.

6.      Defendant Peerstar is a corporation organized under Pennsylvania law with headquarters located at 400 Lakemont Park Blvd, Suite 300, Altoona, Pennsylvania 16602

7.      At all relevant times, Peerstar acted by and through its authorized agents, servants, workmen, and/or employees, who were acting within the course and scope of their employment with Peerstar and in furtherance of Peerstar's business.

8.      At all relevant times, Peerstar is and has been an "employer" and/or "federal contractor" as defined under the FCA and is accordingly subject to the provisions of the FCA.

9.      At all relevant times, Peerstar is and has been an "employer" and "agent of a public body" within the meaning of the WBL in that it receives Medicaid funding from the Commonwealth of Pennsylvania and is accordingly subject to the provisions of the WBL.

10.     At all relevant times, Rigatos was an "employee" of Peerstar as defined under the FCA and WBL and was entitled to the protection of the provisions of each said Act.

### JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the claims of Rigatos arise under the laws of the United States and Rigatos is seeking redress for violations of federal laws. The Court has supplemental jurisdiction over the

remaining claims pursuant to 28 U.S.C. § 1367, because such claims are so closely related to

Rigatos' federal claims that they form part of the same case or controversy

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Peerstar owned,

operated, and controlled a facility located at 816 Baltimore Pike, Glen Mills, Pennsylvania

19342, which is located within the Eastern District of Pennsylvania and a substantial part of the

events and omissions giving rise to this action occurred within the Eastern District of

Pennsylvania at that facility.

**FACTUAL BACKGROUND**

A.     Peerstar and its Peer Support Business Model

13.     Peerstar's business model relies on the premise that individuals who are

struggling with their mental health and/or substance abuse recovery benefit from peer support or

being around people who have previously struggled with those issues.

14.     Peerstar describes the peer support system it provides patients as goal-based,

structured and purposeful; provided by trained peer specialists with lived experience; flexible (at

home, in the community, or via telehealth); covered by Medicaid at no cost to you; and built on

genuine connection and understanding. *See* Peerstar's About Section at

https://www.peerstarllc.com/about. (last accessed on June 18, 2026).

15.     To support its business model, Peerstar hires individuals to work as Certified Peer

Support Specialists ("CPS") and Certified Recovery Specialists ("CRS").

16.     The CPS position is critical to Peerstar's business model as the company states

that it "exists for the spaces and situations in between – the gaps clinical care can't always

reach." *See* Peerstar's About Section at https://www.peerstarllc.com/about. (last accessed on June

18, 2026).

17.     In a recent job posting for the CPS position, Peerstar describes the job duties for its CPS employees in the following way:

    a.     Inspire hope in individuals through community-based 1:1 peer support.

    b.     Your job is designed to promote empowerment and self-determination.

    c.     Building trust through your lived experience and offering tools to help others achieve growth.

18.     CPS employees are not required to have any background or experience with providing mental health and/or substance abuse recovery services to others before working at Peerstar. Instead, Peerstar only requires the following qualifications for its CPS employees

    a.     Must be able to attest to having a mental health diagnosis and have reached a point in their recovery pathway where they can positively support others in similar situations.

    b.     Eighteen (18) years of age and older.

    c.     Must have maintained 6 months of consecutive employment or volunteer work experience; OR within the last three (3) years, have maintained at least 12 months of successful full or part-time paid or volunteer work experience.

    d.     Must be able to participate in a two-week course to receive state-issued certification or possess a PCB state-issued CPS certification.

    e.     Ability to use iPad for documentation.

    f.     Must have a driver's license and reliable transportation.

B.     Peerstar's Medicaid-Funded Services and Billing Practices

19.     Peerstar states that its peer support services are fully funded by Medicaid and individuals with Medical Assistance (MA) coverage in Pennsylvania and a qualifying mental health diagnosis pay nothing for Peerstar's services. See Peerstar's How It Works Section at https://www.peerstarllc.com/how-it-works. (last accessed on June 18, 2026).

4

20.     The type of peer support services Peerstar provides a patient is contained within that patient's individual recovery plan ("IRP").

21.     A patient's IRP is created by a Peerstar Program Manager, and the IRP will include how many hours a patient needs to spend with a CPS employee each week.

22.     Upon information and belief, Peerstar's Program Managers are supposed to calculate the number of hours a patient needs with a CPS employee by using the Adult Needs and Strengths Assessment ("ANSA") and other clinical tools.

23.     Upon information and belief, Peerstar's Program Managers are supposed to account for and incorporate the information CPS employees provide about patients. For example, if a CPS employee informs a Program Manager that a patient's medication is making them too drowsy to receive the number of hours in the IRP, then the Program Manager should make downward adjustments in the IRP plan based on those CPS employee's observations.

24.     In practice, Peerstar's Program Managers rarely account for and incorporate the information CPS employees provide about patients when creating or modifying a patient's IRP.

25.     Upon information and belief, Peerstar Program Managers have full authority to assign the number of hours a patient receives with a CPS employee.

26.     Upon information and belief, Peerstar Program Managers have authority to assign their patient any number of hours with a CPS employee they deem necessary, even if that deviates from the ANSA or other clinical resources.

27.     Peerstar financially benefits whenever its Program Managers assign their patients a higher number of hours with CPS employees.

5

C.     Rigatos' Reporting of Peerstar's Illegal Conduct

28.     On December 22, 2025, Rigatos began her employment with Peerstar as a CPS employee.

29.     Rigatos was assigned to work at a facility that was owned and operated by Sterling Health Care & Rehabilitation, LLC ("Sterling"). Peerstar works with facilities like Sterling across Pennsylvania and provides peer support services to patients of facilities like Sterling. As a result, Peerstar is dependent upon companies like Sterling to survive.

30.     For the first two weeks of her employment, Rigatos' employment was limited to training for the CPS position. Thereafter, Peerstar continued to provide Rigatos and other CPS employees training while they worked with patients.

31.     When Rigatos and other CPS employees provided in-person services to patients, they carried an iPad that contained information about the patient, goals for the patient, and the number of hours a patient was assigned as part of their IRP. In addition, the iPad tracked the amount of time a CPS employee spent with a patient for Medicaid billing purposes.

32.     When Rigatos and other CPS employees provided in-person services to patients, they were trained to record their Medicaid-billed time from the moment they entered a patient's room to the moment they left the room. So, even if a CPS employee only spent 30 minutes providing services to a Peerstar patient, Peerstar instructed CPS employees to bill for a full hour if that CPS employee spent an hour in that patient's room.

33.     In March 2026, Rigatos was providing services to a Peerstar patient whose medication was making them drowsy. Rigatos informed her supervisor, Paula Burnett, that the patient was sleeping for a large portion of their visit. Burnett replied, "so, what? Watch her

6

sleep." From then on, Peerstar expected Rigatos to record Medicaid-billed time for her entire scheduled visit with patients even when that patient was asleep for most of that visit.

34.     From February to April 2026, Rigatos observed instances of wrongdoing involving patients of Sterling, such as heavily medicated patients who were left unattended in their room and other areas of the facility for hours; semi-ambulatory patients who were neglected by Sterling staff and forced to sit in dirty diapers for extended periods of time; patients who were punished after reporting abusive behavior by Sterling staff; and black mold inside a patient's room. For each of these instances of wrongdoing, Rigatos made reports to her supervisor, who told Rigatos to stay out of it.

35.     Upon information and belief, Rigatos' supervisor told her to "stay out of it" because Peerstar could not risk doing anything to upset Sterling, because Peerstar was dependent upon Sterling for patients and a facility to conduct their peer support services.

36.     From February to April 2026, Rigatos also reported numerous instances of fraudulent Medicaid billing by Peerstar, which included recording Medicaid-billed time for services that did not occur and recording Medicaid-billed time for services involving patients who were too medicated to participate in peer support services. When Rigatos reported each of these issues, she was again told to ignore it and continue recording all the time she spent with patients.

37.     Rigatos reported other billing-related issues involving her patients to her supervisor. To bill Medicaid for their services, Peerstar needed their patients to sign the CPS employee's iPad at the conclusion of each session. Rigatos informed her supervisor that many of her patients were too medicated to understand what they were signing. In some situations, the patient had difficulty signing the iPad. Rigatos' supervisor told her that she had to get the patient

to sign the iPad no matter what. If she didn't, Peerstar told Rigatos that her compensation would be negatively impacted.

38.     Finally, Rigatos also notified her supervisor that one of her patients was unable to complete their 7 hours of assigned peer support services due to their medication. After Rigatos notified her supervisor that this patient's peer support hours should be cut because her medication was making her too drowsy to participate in services, Peerstar told Rigatos to continue working and recording her Medicaid-billed time for all the hours that Peerstar assigned that patient. Shortly thereafter, one of the Program Managers increased the number of hours that patient was assigned from 7 to 8 hours per week.

39.     Upon information and belief, Peerstar never made any reductions to the number of patient hours CPS employees recorded for Medicaid billing purposes. In fact, in March 2026, a Peerstar Director established and implemented a new directive which required all CPS employees to work a minimum of 6 hours per week with each of their assigned patients. As a result, Peerstar knowingly and routinely billed Medicaid for services it did not provide its patients.

40.     Just weeks after Rigatos began persistently reporting to Peerstar instances of wrongdoing involving Sterling's patients and fraudulent Medicaid billing by Peerstar, Rigatos was placed on suspension "due to waste, fraud, and abuse concerns." Shortly thereafter, Peerstar terminated Rigatos' employment.

**STATEMENT OF CLAIMS**

**COUNT I**
Violations of the FCA
(Plaintiff v. Defendant)

41.     Rigatos incorporates by reference the allegations in Paragraphs 1 through 40, as if fully set forth herein.

42.     By the actions described above, among others, Peerstar retaliated against Rigatos by terminating her employment weeks after she began reporting numerous instances of fraudulent Medicaid billing by Peerstar, in violation of the FCA.

43.     As a direct and proximate result of the Peerstar's unlawful conduct in violation of the FCA, Rigatos has suffered, and continues to suffer, economic injury, harm to her reputation, humiliation, embarrassment, mental anguish, emotional distress, discomfort, and/or other injuries and irreparable harm for which she is entitled to an award of monetary damages, special damages, and other relief.

**COUNT II**
Violations of the WBL
(Plaintiff v. Defendant)

44.     Rigatos incorporates by reference the allegations in Paragraphs 1 through 43, as if fully set forth herein.

45.     By the actions described above, among others, Peerstar retaliated against Rigatos by terminating her employment weeks after she began reporting numerous instances of waste and wrongdoing involving patients who were under the care, custody, and control of Peerstar and/or patients who Peerstar had a legal responsibility over, in violation of the WBL.

46.     As a direct and proximate result of the Peerstar's unlawful conduct in violation of the WBL, Rigatos has suffered, and continues to suffer, economic injury, harm to her reputation,

9

humiliation, embarrassment, mental anguish, emotional distress, discomfort, and/or other injuries and irreparable harm for which she is entitled to an award of monetary damages, special damages, and other relief.

## REQUESTS FOR RELIEF

Accordingly, Rigatos requests that this Court enter judgment on her behalf and enter an order directing the award of other relief, as follows:

A.      Finding that Peerstar violated the FCA;

B.      Finding that Peerstar violated the WBL;

C.      Awarding Rigatos back pay, lost benefits, and other emoluments of employment and such other relief as is necessary to make her whole;

D.      Awarding Rigatos double back pay damages pursuant to the FCA:

E.      Awarding Rigatos compensatory damages;

F.      Awarding Rigatos special damages;

G.      Awarding Rigatos attorneys' fees and costs;

H.      Awarding Rigatos pre- and post-judgment interest as provided by law;

I.      Injunctive relief and such other and further equitable relief as the Court deems necessary and proper; and

J.      Awarding Rigatos any other relief to which she is entitled and/or which this Court deems necessary and proper.

**A jury trial is demanded for all claims triable by jury.**

Respectfully submitted,

/s/ Sammy Sugiura
Sammy Y. Sugiura
Greenberg Gross LLP
1650 Market Street, Suite 3600,
Philadelphia, PA 19103
SSugiura@GGTrialLaw.com

**Counsel for Plaintiff**

11